OPINION
Douglas S. Winger pled no contest to aggravated possession of methamphetamine and to possession of cocaine, both fifth degree felonies, after the trial court overruled, in part, his motion to suppress evidence. The court found him guilty, and it sentenced him to twenty-four months of community control. Winger appeals from his conviction, *Page 2 
claiming that the trial court erred when it denied, in part, his motion to suppress. For the following reasons, Winger's conviction is affirmed.
 I. {¶ 1} The state's evidence at the suppression hearing reveals the following facts:
 {¶ 2} At approximately 1:15 a.m. on February 13, 2005, Deputy Wendy Fritz of the Darke County Sheriff s Office observed Winger driving his van southbound on Cochran Road. Winger stopped at the intersection of Cochran Road and Hiestand Road, and he turned onto Hiestand Road in front of Fritz's cruiser, traveling westbound. Fritz called in Winger's license plate. When Winger reached the next stop sign, Winger turned southbound. At the next intersection, he turned eastbound onto Rossburg-Lightsville Road. Fritz followed him as she waited for information from the dispatcher "because it seemed like he was following the block, which was unusual for that time [of day]." While traveling on Rossburg-Lightsville Road, Fritz received Winger's name and the make of his vehicle from dispatch. At the next intersection, Winger turned northbound onto Riegle Bell Road. Fritz observed that Winger's van did not have a license plate light, and at 1:17 a.m., she initiated a traffic stop. Fritz indicated that it would normally take twenty minutes to process a license plate light violation.
 {¶ 3} Fritz approached Winger's van along the passenger side, and she noticed that he was the only occupant. She asked to see Winger's driver's license, registration, and insurance. Winger provided the documentation. Fritz also asked Winger from where he was coming. Winger responded that he had been visiting his children and was on his way home. When asked why he was circling instead of going directly home, Winger explained that his parents, with whom he resided, did not allow him to smoke at the house and that he was driving around while *Page 3 
he smoked.
 {¶ 4} While Winger spoke with Fritz, Winger was leaning back to his right, toward the center of the vehicle. Fritz testified: "[He] kept leaning kind of awkward and off to the side, and what I could see was a box behind the driver's seat which was full of chemicals. And up to that point, it was suspicious to me because we had known beforehand that moving meth labs contain those types of chemicals. And it appeared to have some sort of wire tubing in the box, but the view was obstructed for the unnatural lean from Mr. Winger." Fritz further explained that Winger was not leaning towards the passenger window; "It wasn't a lean to hear what I was saying or to speak to me. It was a lean to cover an area that I could tell." Winger testified that he was wearing his seat belt and that he had to lean to reach his registration, which was located in the pocket behind the seat.
 {¶ 5} As Fritz returned to her cruiser, she suspected that Winger's vehicle was a mobile meth lab. She immediately called Sergeant Shawn Trissel by radio and asked him to come to the scene. Fritz wanted Trissel for back up and to verify the contents of the box. Fritz then contacted the dispatcher by telephone and asked for information on whether she had had any prior calls involving Winger. Fritz stated that she recognized Winger's name but "couldn't place it." The dispatcher informed Fritz that she had responded to a domestic violence call at Winger's former address on Cohee Road in 2001, during which officers had located over 1000 grams of marijuana and over $3,000 in cash.
 {¶ 6} Trissel arrived at approximately 1:30 a.m. Upon his arrival, Fritz informed him that she had observed a box behind the driver's seat and that she wanted him to take a look. Fritz also told Trissel that she would approach on the driver's side and that she wanted him to *Page 4 
approach on the passenger side of the vehicle. Fritz and Trissel then approached the vehicle together. Fritz spoke with Winger about their prior encounter in 2001 while Trissel looked into the van. Trissel observed speaker wire and chemicals, such as starter fluid or brake fluid, inside the box. He also saw some possibly empty containers in the back, which would be consistent with a mobile meth lab. Fritz noticed that the van had a different smell than she had notice before. She testified that the van smelled like air freshener, which, in her experience, has been used when someone has been drinking or smoking something illegal and the person is trying to mask the smell. Neither Fritz nor Trissel questioned Winger about the contents of the box. Winger testified that the box contained maintenance supplies for his van.
 {¶ 7} Fritz and Trissel returned to the cruisers. Trissel shared Fritz's suspicions that drugs were located in the vehicle. After a brief discussion, they decided to call a canine unit to the scene. At 1:36 a.m., Trissel called dispatch and requested a canine unit. Because the Darke County Sheriffs canine unit was off that morning, a unit from the Union City Police Department was dispatched. While waiting for the canine unit, Fritz and Trissel discussed what they had observed and Fritz informed Trissel of her prior encounter with Winger. Although Fritz could have written the citation for the misdemeanor traffic violation, she did not prepare a ticket while waiting for the canine unit. Winger remained seated in his vehicle.
 {¶ 8} Sergeant Kevin Smith and his police canine arrived at 2:13 a.m. Fritz informed Winger that a canine would sniff his vehicle, and Winger was instructed to remain seated in his van with his hands on the steering wheel and his feet still. Smith walked the dog around the van, and the dog alerted to the presence of narcotics. Fritz informed Winger that his van would be searched, and she asked him to step out and talk with Smith. Smith handcuffed Winger, *Page 5 
explained the canine's sniff of the vehicle, and spoke with Winger about the drugs that were in the van. Upon searching the vehicle, Fritz and Trissel located marijuana, a powdery substance consistent with cocaine and methamphetamine, and drug paraphernalia. Winger was arrested and taken to the Darke County jail. He received the traffic ticket after he was incarcerated.
 {¶ 9} On July 29, 2005, Winger was indicted for aggravated possession of drugs (methamphetamine), possession of cocaine, and trafficking in marijuana. Winger pled not guilty to the charges, and he was released on a recognizance bond.
 {¶ 10} On November 28, 2005, Winger filed a motion to suppress the controlled substances, the drug paraphernalia, currency, and all statements taken or made by him. He argued that the traffic stop involved an unreasonably long detention, because the officers lacked a reasonable and articulable suspicion of illegal activity to justify his continued detention after the period of time necessary to complete the traffic ticket. Winger further argued that the currency was not contraband and was, therefore, improperly seized. In addition, Winger argued that his statements should be suppressed, because he was interrogated by Smith prior to being apprised of his Miranda rights.
 {¶ 11} On January 5, 2006, the court held a hearing on the motion to suppress. Fritz, Trissel and Smith testified on behalf of the state; Winger testified on his own behalf. On January 25, 2006, the court overruled in part and sustained in part the motion to suppress. The court concluded that Deputy Fritz had sufficient facts to justify the detention of Winger beyond the amount of time necessary for a typical traffic stop. It thus found that the search of the vehicle after the alert by the canine was valid. The court suppressed Winger's statements after he was handcuffed and placed inside the cruiser, stating that the state had failed to show that the *Page 6 
statements were volunteered or that Miranda warnings had been previously given. Winger subsequently pled no contest to aggravated possession of drugs and possession of cocaine, and he was sentenced accordingly.
 II. {¶ 12} Winger raises one assignment of error on appeal.
 {¶ 13} "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE, IN THAT APPELLANT'S DETENTION EXCEEDED THE REASONABLE TIME NECESSARY FOR A TRAFFIC STOP IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS."
 {¶ 14} In his sole assignment of error, Winger claims that the trial court erred in failing to suppress the items found in his vehicle. We note that Winger has not challenged the validity of the original stop of his vehicle for a license plate light violation. Nor does this appeal involve the statements that he made to the officers, as those statements were suppressed by the trial court.
 {¶ 15} A traffic stop by a law enforcement officer must comply with the Fourth Amendment's reasonableness requirement. Whren v. UnitedStates (1996), 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89; State v.Ramos, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523, ¶ 10. A police officer may detain a motorist long enough to issue "a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates." Id. at ¶ 11, quoting State v. Aguirre, Gallia App. No. 03CA 5, 2003-Ohio-4909;State v. Colton, Montgomery App. No. 20760, 2005-Ohio-4494, ¶ 19. A traffic stop may last no longer than is necessary to resolve the issue that led to the original stop, *Page 7 
unless specific articulable facts exist that warrant an extension of the detention. Ramos at ¶ 10-11. In determining whether the length of the stop was reasonable, a court must consider the totality of the circumstances surrounding the detention and whether the officer was diligent in his investigation. Id. at ¶ 11.
 {¶ 16} If a canine sniff is conducted before the reasonable completion of the routine traffic stop procedures, no additional suspicion of criminal activity is needed for the sniff. Colton at ¶ 19;Ramos at ¶ 12. But if the traffic stop is extended beyond a reasonable time for the purpose of conducting a canine sniff, the police officer must have a reasonable suspicion that the vehicle contains drugs in order to detain the suspect further while a drug-trained canine is brought to the scene. Ramos at ¶ 13. In considering whether a reasonable suspicion exists, we evaluate the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." State v. Heard, Montgomery App. No. 19323, 2003-Ohio-1047, quoting State v. Andrews (1991), 57 Ohio St.3d 86, 87-88,565 N.E.2d 1271.
 {¶ 17} The crux of Winger's argument is that Fritz did not diligently complete the citation for the license plate light violation and that he was unreasonably detained beyond the twenty minutes necessary to complete the traffic stop for the license plate light violation.
 {¶ 18} Initially, Winger argues that Fritz unreasonably delayed the completion of the traffic citation to await the arrival of Trissel. According to Fritz's testimony, she stopped Winger at 1:17 a.m., approached his vehicle from the passenger side, and requested his driver's license, registration, and insurance. Fritz requested Trissel's presence at the scene and then contacted dispatch to determine if she had had any prior involvement with Winger. She called *Page 8 
in Winger's driver's license at that time. Fritz received information about the Cohee Road incident approximately two to three minutes later. She did not receive information on Winger's driver's license until after Trissel was en route to the scene. Fritz did not recall if she received the information before or after Trissel arrived. Trissel arrived approximately thirteen minutes after the initial stop was made. Fritz testified that a routine traffic stop for a license plate light violation would typically take twenty minutes to complete. Although Fritz had not completed the traffic citation prior to Trissel's arrival — and, in fact, she had not begun to write the citation — the record does not reveal that Fritz would have completed the citation prior to Trissel's arrival even if she had acted diligently. Accordingly, the record does not support Winger's contention that Fritz unreasonably prolonged his detention pending Trissel's arrival.
 {¶ 19} Next, Winger claims that Fritz and Trissel unreasonably prolonged his detention for an additional period of time to await the arrival of the police canine unit. He asserts that the officers lacked a reasonable and articulable suspicion that his vehicle contained drugs. We disagree.
 {¶ 20} At the time that Trissel called for a canine unit, Fritz had the following information: (1) she had observed Winger "following the block," which she found unusual for that time of day; (2) Fritz found Winger's explanation for his driving behavior "odd"; (3) Fritz had heard reports of increased mobile meth labs in the county; (4) Winger was driving a larger vehicle, which mobile meth labs use; (5) Fritz had observed Winger leaning awkwardly as if to obstruct her view of something; (6) Fritz observed a box with chemicals, including starter fluid, which is used in meth labs; (7) Trissel observed potentially empty large containers, which are also used in meth labs; and (8) Fritz had had a prior encounter with Winger during which illegal *Page 9 
drugs had been seized. Viewed in their totality, these are specific, articulable facts that would lead a reasonable police officer to suspect that the van was being used as a mobile meth lab and that illegal drugs might be in the vehicle. Moreover, Fritz, in fact, suspected that Winger was operating a meth lab and that there were illegal drugs in the vehicle. Trissel testified that he shared Fritz's suspicions. Because Fritz had a reasonable, articulable suspicion that Winger's van was a mobile meth lab and that it contained illegal drugs, she was justified in continuing his detention beyond the time necessary to complete the traffic citation and until the police canine unit arrived 37 minutes later. At this juncture, because Winger was being detained for suspected drug activity, Fritz's failure to complete the traffic citation while awaiting the drug canine had no bearing on the constitutionality of his detention.
 {¶ 21} Winger's assignment of error is overruled.
 {¶ 22} The judgment of the trial court will be affirmed.
 WOLFF, PJ. and FAIN, J., concur. *Page 1