[Cite as *State v. Murphy*, 2026-Ohio-143.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-20 |
| Appellee | : | |
| | : | Trial Court Case No. 22CR00321 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| JESSICA L. MURPHY | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on January 16, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


For the court,

*Christopher B. Epley*

_____
CHRISTOPHER B. EPLEY, PRESIDING JUDGE

TUCKER, J., and LEWIS, J., concur.

COLIN P. COCHRAN, Attorney for Appellant
CHRISTOPHER P. LANESE, Attorney for Appellee

EPLEY, P.J.

{¶ 1} Jessica L. Murphy appeals from her conviction in the Darke County Court of Common Pleas on one count of aggravated possession of drugs, a fifth-degree felony. For the following reasons, the trial court's judgment is affirmed.

**I. Facts and Procedural History**

{¶ 2} According to the State's evidence at trial, at approximately 7:15 a.m. on July 27, 2022, Detective (now Lieutenant) Joseph Monnin of the Greenville Police Department initiated a traffic stop of a Chevy Malibu on North Ohio Street after observing that the vehicle's license plate had expired. Upon approaching the vehicle along the passenger side, Monnin saw that the driver, Murphy, was the only occupant.

{¶ 3} Detective Monnin informed Murphy of the reason for the stop, and she provided appropriate paperwork. She indicated that the vehicle belonged to her teenaged son. While they spoke, Monnin observed a backpack on the front passenger seat. He also saw a torch lighter, which can be used with cigarettes but is commonly used by methamphetamine users. Murphy appeared to be nervous and was smoking the butt of a cigarette.

{¶ 4} Based on his observations, the detective asked if he could search the vehicle, but Murphy said no. Monnin then radioed for the assistance of a K-9 unit, and he asked Murphy to exit the Malibu. Murphy responded that she was not going to get out of the car. Monnin gave repeated orders for Murphy to exit the vehicle, to which Murphy repeatedly refused to comply. Officer Ben Conley arrived as backup, and the officers forcibly removed

2

her from the car. As the officers handcuffed Murphy, Monnin notified her of her *Miranda* rights. He then placed her in the back seat of his cruiser.

{¶ 5} Soon thereafter, Darke County Deputy Sheriff Jamie Joseph arrived with his K-9 partner, Oakley. After the Greenville police officers informed him that they wanted a free-air sniff, Joseph gave Oakley a command to search for drugs and the deputy walked Oakley up to and around the Malibu. On the second pass around the car, Oakley alerted to an odor of drugs.

{¶ 6} Detective Monnin began searching the Malibu. In the backpack, he found a make-up bag containing a glass meth pipe and a baggie of an unknown crystal substance, both of which were wrapped in a paper towel with a hair tie. He also saw additional suspected illegal drugs, including pills, marijuana dab wax (now legal to possess), and an unknown off-white powder. The backpack included other items belonging to Murphy, such as her work identification badge. When asked about the substances found in the backpack, Murphy said that the powder was denture cream and the methamphetamine was not hers.

{¶ 7} On August 22, 2022, the Greenville police submitted the crystal substance and the unknown powder to the Ohio Bureau of Criminal Investigation ("BCI") for analysis. The powder was found to contain no controlled substance. The other item was determined to be a crystalline solid substance weighing 1.28 grams, plus or minus 0.05 grams, containing methamphetamine.

{¶ 8} On December 27, 2022, Murphy was indicted on one count of aggravated possession of drugs (methamphetamine), a fifth-degree felony. She later moved to suppress all evidence obtained from the stop and search of her vehicle, claiming that the officers unlawfully prolonged the traffic stop for the purpose of conducting a canine sniff. She further

challenged the dog's qualifications, training, and reliability. After a hearing, the trial court denied Murphy's motion.

**{¶ 9}** By September 2024, the BCI forensic scientist who had tested the two submissions was no longer employed by BCI, and at BCI's request, the two items were resubmitted for re-examination. Upon retesting, a different forensic scientist obtained similar results. No controlled substance was found in the off-white powder. The crystalline solid substance weighed 1.29 grams, plus or minus 0.05 grams, and was found to contain methamphetamine. The discrepancy in the weight was within the scale's margin of error.

**{¶ 10}** After numerous delays, the matter proceeded to a jury trial on December 17, 2024. The State presented five witnesses—Monnin, Conley, Joseph, the property room manager for the Greenville Police Department, and the forensic scientist who tested the suspected drugs in 2024—and offered several exhibits. Murphy and her boyfriend, William Hudson, testified in Murphy's defense. Their testimony emphasized that the backpack belonged to Hudson, that Hudson had attempted to empty it of other items before putting their belongings in the backpack, that neither was using methamphetamine when the charged offense occurred, and that neither knew that the backpack contained methamphetamine. Detective Monnin provided rebuttal testimony. The jury deliberated and found Murphy guilty of the charged offense.

**{¶ 11}** After a brief recess to allow counsel to review a previously prepared presentence investigation report, the trial court sentenced Murphy. It imposed community control sanctions with the requirements that Murphy serve 180 days at the Darke County Criminal Justice Center and that she pay court costs and related fees within 12 months with monthly payments. The court found that Murphy was entitled to 29 days of jail-time credit as

4

of December 18, 2024. The court's judgment specified that "[n]o further supervision is ordered following Defendant's release from jail."

{¶ 12} Murphy appeals from her conviction, raising two assignments of error. We address them in reverse order.

## II. Motion to Suppress

{¶ 13} In her second assignment of error, Murphy claims that the trial court erred in failing to suppress the evidence obtained from the search of her vehicle. She contends that the State failed to show that Oakley was certified prior to the free-air sniff and, therefore, his alert did not establish probable cause to search her vehicle. Murphy does not challenge the validity or duration of the stop.

{¶ 14} An appeal from a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Ojezua*, 2016-Ohio-2659, ¶ 15 (2d Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, ¶ 10 (2d Dist.). As a result, we must accept the trial court's factual findings if they are supported by competent and credible evidence. *Id*.; *State v. Hale*, 2024-Ohio-4866, ¶ 12. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Turner* at ¶ 10, quoting *State v. Koon*, 2015-Ohio-1326, ¶ 13 (2d Dist.). The trial court's application of law to the findings of fact is subject to a de novo standard of review. *State v. Shepherd*, 2021-Ohio-4230, ¶ 10 (2d Dist.).

{¶ 15} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1 (1968). Police officers may briefly stop and temporarily detain individuals to investigate possible criminal activity if

5

the officers have a reasonable, articulable suspicion that criminal activity has occurred, is occurring, or is about to occur. *Terry*; *State v. Mays*, 2008-Ohio-4539, ¶ 7-8. Reasonable suspicion of a minor traffic-related offense is sufficient to justify an investigatory detention. *State v. Fleming*, 2022-Ohio-1876, ¶ 12 (2d Dist.).

{¶ 16} A free-air sniff by a drug-detecting dog does not constitute a "search" under the Fourth Amendment. *State v. Cantu*, 2024-Ohio-3211, ¶ 29 (2d Dist.). Consequently, a police officer is not required to have reasonable suspicion that a vehicle contains contraband before summoning a K-9 unit or conducting a canine free-air sniff during a traffic stop. *State v. Thomas*, 2009-Ohio-3520, ¶ 15 (2d Dist.). "If a trained canine alerts to the odor of drugs from a lawfully stopped and detained vehicle, an officer has probable cause to search the vehicle for contraband." *State v. Boyce*, 2020-Ohio-3573, ¶ 73 (2d Dist.).

{¶ 17} The State may establish the K-9's reliability by presenting evidence of the dog's training and certification. *State v. Rice*, 2013-Ohio-1071, ¶ 25 (2d Dist.). Evidence of the dog's training and certification may be either testimonial or documentary. *Id*., citing *State v. Mangan*, 2009-Ohio-6137 (2d Dist.). Once the State establishes the dog's reliability, the defendant can attack the dog's "credibility" with evidence relating to training procedures, certification standards, and real-world reliability. *Mangan* at ¶ 12, citing *State v. Lopez*, 2006-Ohio-2091, ¶ 5 (1st Dist.).

{¶ 18} On appeal, Murphy asserts that the State failed to establish that Oakley was certified prior to July 27, 2022, the date of the traffic stop. She does not claim that his alert was otherwise not credible. Accordingly, we focus on the suppression hearing evidence related to Oakley's training and certification only.

{¶ 19} Deputy Joseph stated that the certification process involves in-house training through the Darke County K-9 Training Academy and takes approximately two months,

6

depending on what the dogs are being certified in. Joseph and Oakley went through training together. The deputy detailed the process for training dogs on drug detection, describing how dogs are trained to recognize one odor before another drug is added. When the officer and dog have completed the required training hours and the certified trainer believes the dog will pass the Ohio Peace Officer Training Academy ("OPOTA") certification test, the K-9 unit then sits for the OPOTA test. The drug portion of that test involves searching for drugs in vehicles and different areas of a building.

{¶ 20} Deputy Joseph testified that Oakley passed the certification test, and the State offered a copy of Oakley's "most recent training certification" (State's Exhibit 3), which indicated that Deputy Joseph and Oakley had completed the Special Purpose Canine Unit Evaluation and were certified in tracking, article search, cocaine, heroin, methamphetamines and their derivatives. The certification was dated October 11, 2022, and showed a renewal deadline of December 8, 2023.

{¶ 21} When asked on cross-examination about the October 11, 2022 certification date (which was after the date of Murphy's traffic stop), Joseph explained that Oakley was initially certified on December 8, 2021, and that he needed to recertify every 12 months. Oakley had recertified on October 11, 2022, for the next year, and he was required to recertify again by December 8, 2023. Oakley's certification had never been suspended or revoked.

{¶ 22} In overruling Murphy's motion to suppress, the trial court concluded, and we agree, that the State's evidence regarding Oakley's training and certification was sufficient to establish Oakley's reliability. Although State's Exhibit 3 was dated after Murphy's traffic stop occurred, Deputy Joseph's testimony established that he and Oakley had completed

7

the requisite training, had passed the OPOTA certification test, and were certified in the detection of methamphetamine, among other things, as of December 8, 2021.

{¶ 23} Murphy's second assignment of error is overruled.

### III. Sufficiency and Manifest Weight of the Evidence

{¶ 24} Murphy's first assignment of error claims that her conviction was based on insufficient evidence. She asserts that she had no knowledge that Hudson's backpack contained methamphetamine and that Monnin's testimony was not sufficient to prove beyond a reasonable doubt that she knew about it. Murphy does not expressly raise that her conviction was against the manifest weight of the evidence. However, considering that her argument revolves around the credibility of the witnesses, we infer that she is also asserting a manifest-weight argument.

{¶ 25} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id*.

{¶ 26} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review

8

the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 27} Murphy was convicted of aggravated possession of drugs in violation of R.C. 2921.11(A). This statute provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." *Id.*

{¶ 28} "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Possession of a drug may be either actual physical possession or constructive possession. *State v. Mabry*, 2007-Ohio-1895, ¶ 18 (2d Dist.). "A person has constructive possession of an object when he or she is conscious of the presence of the object and able to exercise dominion and control over it, even if it is not within his or her immediate physical possession." *State v. Keister*, 2022-Ohio-856, ¶ 44 (2d Dist.). "Establishment of ownership is not required." *State v. Rastbichler*, 2014-Ohio-628, ¶ 33 (2d Dist.).

{¶ 29} Courts may consider all the facts and circumstances surrounding the incident to determine whether an individual knowingly possessed an item. *State v. Rupert*, 2024-Ohio-5027, ¶ 12 (2d Dist.). Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991); *State v. St. John*, 2019-Ohio-650, ¶ 49 (2d Dist.). "Evidence that drugs were discovered in close proximity to the accused may

9

constitute sufficient circumstantial evidence to support a finding of constructive possession." *State v. Eastridge*, 2002-Ohio-6999, ¶ 31 (9th Dist.), quoted by *Rupert* at ¶ 12.

{¶ 30} Construing the evidence in the light most favorable to the State, there was sufficient evidence from which the jury could have reasonably concluded that Murphy constructively possessed the methamphetamine in the backpack. Murphy was the driver and sole occupant of the Malibu, and the methamphetamine was found in a backpack located on the front passenger seat of the vehicle. That evidence, alone, was sufficient to prove that Murphy constructively possessed the methamphetamine. Additionally, Murphy agreed that she and Hudson jointly used the backpack and that it contained some of her personal items, including her make-up bag and work identification. Detective Monnin testified that the glass meth pipe and methamphetamine were in the make-up bag. From this evidence, the jury could have reasonably concluded that Murphy knowingly possessed the methamphetamine. It was irrelevant that Murphy reportedly did not own the backpack in which the drugs were found.

{¶ 31} Murphy asserts that she had no knowledge that Hudson's backpack contained methamphetamine, and she emphasizes that Monnin's testimony was "wholly contradictory."

{¶ 32} Hudson testified that on July 26-27, 2022, he and Murphy both worked third shift (11:00 p.m. to 7:00 a.m.) for the same company, and they packed their work badges, vests, cigarettes, lunch, and other items in the same backpack. Prior to that night, they had used a backpack that Murphy owned, but that backpack had gotten ruined. On the night of July 26, Hudson transferred their belongings to a backpack that he owned and had previously used. He testified that he dumped out that backpack, and he "kind of went through it a little bit and put our stuff in." Hudson did not recall seeing methamphetamine in the

10

backpack, and he indicated that he would have discarded it if he had. Both Hudson and Murphy denied that they were using methamphetamine then. Murphy testified that she never went through the backpack before she went to work on July 26. Murphy drove home alone after work on July 27, because Hudson had left work early due to illness.

{¶ 33} Hudson testified that the marijuana dab was his, but not everything in the backpack belonged to him, particularly the glass meth pipe. He said he did not use a bubble pipe to smoke methamphetamine and had no reason to have one because he and Murphy snorted methamphetamine. Hudson said that he did not recognize the glass meth pipe and that it was not in the backpack: "I know I packed that bag, and I know that wasn't in there." Hudson admitted to having a prior theft offense and told the jury that he had never denied his past crimes. Hudson acknowledged that he did not want to see Murphy get into trouble.

{¶ 34} Murphy testified that she did not know that there were drugs in the backpack, other than the dab wax, which she and Hudson shared. She acknowledged that her cosmetic bag was in the backpack but asserted that it only contained make-up and dental powder. As with Hudson, she testified that the glass meth pipe was not hers. She indicated that she had used glass pipes previously, but it "wasn't my go-to thing." Murphy reiterated that she did not put methamphetamine in the backpack and did not know that it was there.

{¶ 35} As for the "contradictions" in Detective Monnin's testimony, Monnin testified that the glass meth pipe and methamphetamine were found inside a make-up bag, but the incident report that he had prepared contemporaneously with the incident simply stated that they were in the backpack. In addition, in discussing the chain-of-custody of the drugs, Monnin misremembered when the seized items were placed in an evidence locker at the police station. On direct examination, he testified that he took the glass meth pipe and suspected drugs back to the police station, photographed them, and placed them in a locker

11

in the property room. On cross-examination, however, Monnin acknowledged that the photo log (Defendant's Exhibit C) was dated August 2, 2022, not July 27, 2022. Monnin then stated that he would have kept the seized items in a safe in his office until he was ready to photograph them and put them in the property room. He said that he was testifying to the best of his recollection.

**{¶ 36}** It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Murphy had knowingly possessed the methamphetamine. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2021-Ohio-3947, ¶ 27 (2d Dist.). Although there was some evidence from which the jury could have reached a different verdict, we cannot conclude that the jury lost its way when it found Murphy guilty of aggravated possession of drugs. Murphy's conviction was not against the manifest weight of the evidence.

**{¶ 37}** Murphy's first assignment of error is overruled.

### IV. Conclusion

**{¶ 38}** The trial court's judgment is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and LEWIS, J., concur.